NOT DESIGNATED FOR PUBLICATION

No. 118,362

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of M.D.M.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed May 18, 2018.
Affirmed.

*Michael J. Nichols*, of Michael J. Nichols, P.A., of Kansas City, for appellant.

*Crystal Elaine Ellison*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for
appellee.

Before GARDNER, P.J., GREEN and SCHROEDER, JJ.

PER CURIAM:  B.M. (Father) and R.S. (Mother) appeal from the Wyandotte
County District Court's order adjudicating that their 13-year-old son, M.D.M. is a child in
need of care (CINC) under the Revised Kansas Code for Care of Children, K.S.A. 2017
Supp. 38-2201 et seq. The parents contend the State failed to prove by clear and
convincing evidence that M.D.M. was without adequate parental care or control or that he
lacked parental care necessary for his physical, mental, or emotional health. For the
reasons stated later, we affirm the trial court's decision.

M.D.M. came to the attention of the Department of Children and Families (DCF)
and local police on February 22, 2017, several weeks before his 13th birthday. M.D.M.
was placed in protective police custody after he was found walking around on a school

1

day. DCF was contacted and an investigator, Kayla Cape, interviewed him. M.D.M. told Cape that he did not want to return home. The boy, who attended middle school in Kansas City, Kansas, reported that he had gotten into trouble at school that day and that he was afraid to go home; the boy reported that Father hit him in the face when he got into trouble, and Mother occasionally "whopped" him with a belt. M.D.M. reported that he had run away the previous Saturday and his Father hit him and yelled at him for running away. M.D.M. also told Cape that his brother had run away from home a number of months earlier and was living with his grandfather. Cape called the parents' home to tell them about M.D.M.'s status.

Father contacted Cape the next day, February 23, 2017, apparently after being unable to call during DCF's working hours; Father recorded the telephone conversation. During the call, Cape explained M.D.M.'s status, his reports of being afraid to go home, and his allegations of being hit by Father. Father denied ever hitting his son. He admitted, however, that M.D.M. had been acting out in school and had even been arrested and suspended for exposing his penis to girls at the school.

During this first conversation, Cape told Father that family preservation services were available and how she believed such services could help M.D.M. and the family. Father stated that M.D.M. did his chores at home and followed the rules at home. Father maintained that the school would not address M.D.M.'s behavior problems while he was there. Moreover, he asserted that the school was not communicating with the parents to address the school problems. Father indicated it was a school problem, not a family problem. Cape, still, suggested family preservation services was an appropriate program to help M.D.M. address his bad behaviors and to improve communication between the parents, M.D.M., and the school.

When family preservation services were suggested, Father stated he wanted to work with an African-American male social worker who would understand M.D.M.'s

situation. Cape told Father that while DCF had African-American women on staff, there were no African-American men working in the investigations division of DCF. Cape also told Father that family preservation services would actually be provided by Kaw Valley Center (KVC), not DCF. Father found it "odd" that there were no African-American male employees available to work with them and repeatedly expressed his concern that only an African-American man could understand. He told Cape he wanted to talk about the situation with Cape's supervisor. Cape reported that she would try to get her supervisor to call Father.

Cape called the Father again later in the day. She again explained how family preservation services could help M.D.M. learn to do chores and help him with his behaviors at school. Father again reported that M.D.M. did his chores at home and only got into trouble at school. According to Father, the counselors at school did not help M.D.M. despite the family's attempts to communicate with them to get him support at school. Father told Cape he would accept family preservation services if M.D.M. agreed to it, and he could pick up M.D.M. when he was released the next day.

Immediately after this statement, however, Father again requested an African-American male caseworker. Father stated that it was "weird" and "funny" that DCF did not have any male African-American caseworkers to assist the family. Father asserted that an African-American man would understand their situation better, and DCF should have to look into finding African-American counselors, therapists, etc. Cape explained that they would look into the community to try to find resources that would provide the African-American male perspective, but that DCF had no such employees at that time. Father said that DCF "ha[d] to look" into finding men of color in order for the family to work with them. When she asked if he was willing to accept the services from someone other than an African-American man, he again asked if he could talk to her supervisor about finding qualified men of color because he would feel more comfortable in talking

3

to an African-American man about parenting. He also reported that he made the same complaint to KVC a year before when his older son had some problems.

During the conversation, Father returned to his concern about why no African-American males were available. He and Cape discussed whether such men applied to DCF or even had the appropriate education and training to provide those services. Father was sure there were African-American males trained to provide the services. Somewhat frustrated, Cape told Father that she needed to tell the court that day whether the family was going to accept family preservation services. Moreover, she told him that M.D.M. could not be released to the parents without a court order unless the assistance was accepted. When the DCF employee told Father she would be required to get the court involved if the family did not accept services, Father stated he "[did] not care" if she got the court involved or not. Father then insisted again on talking about the lack of African-American men in the field and asked to speak to her supervisor. Nevertheless, the supervisor was not in the office. The worker told Father that she had to make a report about M.D.M. to the court *that afternoon* and that she needed his answer about accepting services. Father again evaded the issue. Father insisted, instead, on speaking with a supervisor. When a supervisor was still not available at that time, the worker again stated she needed to give a decision to the court. Father responded repeatedly, "[d]on't bark no orders at me" and told her to get her supervisor on the phone. The conversation then ended.

Later on February 23, a DCF supervisor called and talked to Father over a speaker phone; Father again recorded the conversation. The supervisor told Father that there was going to be a temporary custody hearing the next day because M.D.M. did not feel safe returning home. The supervisor told them that an investigation was underway into M.D.M.'s family circumstances. Father expressed surprise because he had asked to speak to a supervisor, but a court date was set even though he had not been able to express his concerns to her about the circumstances. The supervisor gave Father the time and

4

location of the hearing the next day. As Father's voice became louder, he demanded to know who she was; she provided her name. At this point, the supervisor heard Mother's voice in the background and repeated that she needed to be sure Mother was told of the time and place of the hearing. Father's voice became louder. He asserted she sounded "funny" and demanded why the supervisor would think Mother was anywhere else but at home. Father stated that she was racist and stated that "her husband would not do her like that." Father asserted that "family don't talk like that" and that "people that's trying to help don't talk like that." The recording ended at that point.

On February 23, 2017, the State filed a petition in Wyandotte County District Court asserting that M.D.M. was a child in need of care. The State alleged that M.D.M. was without adequate parental care, control or subsistence, he was without the care or control necessary for his physical, mental, or emotional health, and that he had been physically, mentally, or emotionally abused or neglected under K.S.A. 2017 Supp. 38-2202(d)(1)-(d)(3). The State also asserted that M.D.M. was willfully and voluntarily absent from his home without his parents' consent as stated in K.S.A. 2017 Supp. 38-2202(d)(9). The State's petition summarized DCF's conversations and contacts with the child and the Father, noting that M.D.M. was afraid to go home unless there were services available and that Father refused to accept services because there was not an African-American male caseworker available to work with the family. Along with the CINC petition, the State requested and obtained an ex parte order for protective custody that day. The court also appointed a guardian ad litem (GAL) to represent M.D.M.'s interests.

The petition also included a summary of DCF's previous contact with the family from and after March 2012. In 2012, DCF's predecessor investigated reports that M.D.M.'s older sister was very depressed and needed mental health services. Another report, later found to be unsubstantiated, was made in October 2013 alleging physical abuse of M.D.M. and his older brother by Father and neglect by Mother. Another neglect

report was filed in May 2015 involving the two boys asserting they were not properly fed at home and noting that M.D.M. measured at the 5th percentile in weight for a boy his age. Again, DCF found this neglect report unsubstantiated.

On February 24, 2017, the court held a temporary custody hearing. Mother and Father were present and represented by appointed counsel. There is no transcript from this hearing, but the journal entry reflects that DCF was granted temporary custody of M.D.M. until an adjudication hearing could be held. No notice of appeal was filed following this order.

At a later preliminary hearing, the court ordered M.D.M. to remain in DCF custody, but granted Mother and Father reasonable supervised visitation. The court also recorded that the parent "may voluntarily cooperate" with any services recommended by KVC. The adjudication hearing was then scheduled on June 15, 2017.

The adjudication hearing started on June 15, 2017, and was continued on August 10, 2017. DCF social worker Cape was the first to testify at the hearing. Cape testified about her first meeting with M.D.M. and his reports of school troubles and alleged physical abuse by his parents. She detailed her conversations with Father over the phone on February 23, 2017. She testified that Father denied physical abuse and that Father reported that all M.D.M.'s issues were school problems, not family problems. She also testified about Father's reluctance to participate in family preservation services and his focus on the unavailability of African-American male social workers. Cape further testified that she was not willing to offer Family Preservation Services to the family at this point because of Father's aggressive behaviors toward DCF, KVC, and the court.

On cross-examination, Cape was asked about her investigation of M.D.M.'s allegations of physical abuse. Cape admitted when she met M.D.M., that she saw no bruises or other indications that he had been hit in the face. Cape also admitted she had

not talked to anyone at M.D.M.'s school or anyone else to determine if they had seen any bruises or outward signs that the boy had been hit in the face. Cape also confirmed that when she first met M.D.M., he admitted he had gotten into trouble at school that day. She again testified that Father had denied hitting M.D.M. but that he had stated that M.D.M. previously had been in trouble at school for exposing his penis to female students. She did not check M.D.M.'s academic or disciplinary record at this time and took no further steps to investigate the allegations of abuse. Cape also admitted that when the hearing started, there was no substantiated evidence that M.D.M. was subject to physical abuse.

M.D.M. was the second witness called by the State. He testified that he was currently living with his grandfather and his brother. M.D.M. testified that his brother had been living with his grandfather for some time because he had run away from their parents' home. M.D.M., who was going into the eighth grade in the fall, admitted he had gotten into trouble at school at least once a week. He also testified that he was disciplined by his parents—by getting hit or getting a "whoopin"—when he got in trouble at school. M.D.M. testified that his Father would hit him in the face and chest with a fist; his glasses broke at least once. At the times his Father hit him, M.D.M. said his Father was yelling, was angry, and was upset. He also testified that his Mother gave him a "whoopin" once a month with a belt on his butt; he normally would be wearing his underwear but not pants. He reported that he also might get hit if he intentionally broke something. M.D.M. also testified that he witnessed aggression and verbal abuse between his parents regularly; his parents would "call each other out their name" on a weekly basis, apparently indicating they called each other names "[l]ike the B word." M.D.M. testified that he felt safe at home sometimes and was afraid of Father and Mother sometimes. He told the court that he would be willing to go home for a visit, but he did not want to actually go live with them at the time of the hearing.

When questioned by his GAL, M.D.M. stated that he had run away from home twice. The first time was because he got into trouble in school and simply did not go

7

home. He ran away the second time because his Father told him the next time he got into trouble and went to court, he would go to foster care. So when he got into trouble at school, he did not go home. M.D.M. admitted that he got into trouble at school for talking too much. Sometimes he got into trouble because he was playing around and not paying attention to school work. M.D.M. testified that other students would distract him and would talk in class, but he would get blamed. He also admitted being disrespectful of the teachers because he would get mad if they acted disrespectful to him. M.D.M. admitted he acted out in school because he was angry. M.D.M. admitted that since he left home, he has gotten into trouble for calling a teacher a name.

On cross-examination, M.D.M. admitted his school situation has gotten worse since he began living with his grandfather, including his grades getting worse. He also admitted that his Father had strict rules in his home and that his Father talked to him a great deal about him needing to behave and act properly when in school. He admitted that his Father got him to participate in a bowling league and took him to community events and meet various civic leaders. His parents also emphasized the importance of school and about getting an education. M.D.M. further admitted that his Father's punches did not leave marks on his face, but sometimes would break his glasses. M.D.M. did not report his parents' physical discipline to anyone at the school.

During cross-examination, M.D.M. admitted he made good grades while living with his parents and his teachers liked his work. His grades were As, Bs, and Cs. He also got into trouble in school when he lived with his parents, and sometimes got suspended. He testified that other students would distract him and get him angry, and then get him into trouble. He agreed that his parents told him to report the other students to his teacher, but he did not. Throughout the school year, every suspension M.D.M. received was longer.

8

M.D.M. also admitted talking to his brother about how things were easier at his grandfather's house. His brother got to go to friends' houses, and his grandfather did not have as many rules as his parents' house. M.D.M. denied, however, running away because he believed they would let him live with his grandfather. By the time he finished classes for the school year, M.D.M. had one C and the rest of his grades were Fs. During that time, he also missed a month of classes because he was suspended from school. M.D.M. testified that he would have to repeat the grade and that he was taking a social studies class in summer school.

These were the only two witnesses called by the State.

Father was the first and only witness called on behalf of the parents. Father testified that he and his wife had always been actively involved in M.D.M.'s life. He asserted that he emphasized the importance of school to M.D.M. and that Father wanted M.D.M. to "get it right." Father denied ever hitting M.D.M. in the face and stated his job was to teach him how to be a young man.

He talked to M.D.M. about how to try and keep out of trouble at school and tried to have conversations with school personnel about his son. He took M.D.M. bowling, tried to teach him to be respectful, and tried to help M.D.M. with his business of making and selling bracelets. Father also introduced M.D.M. to various community leaders to show him positive African-American role models.

When M.D.M. was younger, Father was at the school a lot, but stepped back when M.D.M. started in middle school because he believed M.D.M. needed to start being responsible for his own actions; he needed to learn how to deal with his peers. After M.D.M. got into trouble for exposing himself to his classmates, Father told him that it was the worst thing he could have done. When M.D.M. was suspended for a long period of time, Father knew M.D.M. would struggle to catch up. At that time, Father stated he

9

gave M.D.M. a watch and told him to look at the watch whenever he was about to get into trouble and use it as a reminder to get his work done well. According to Father, it was up to M.D.M. to make decisions about his actions. Father's philosophy toward his 13-year-old son was "I didn't like too much to try to tell him. I just got—gave a suggestion because I mean at the end of the day, you gonna make your own decision for your life and what you want to do." It was up to M.D.M. to "call the shots for . . . what he wanted to do." Father was fine with M.D.M. calling his own shots but he stated that he did not want to be "involved in something that's negative." Father reported that he and M.D.M. would be "like brother[s] and just support each other like that."

When M.D.M. was taken into police protective custody, Father was told that M.D.M. did not want to come home and that he reported being beat. Father was not told if DCF or the police talked to anyone else about M.D.M.'s allegations. Father testified that he was not receptive to DCF's suggestion to get involved in Family Preservation Services, but he had been looking for some type of program to help M.D.M. Father was unhappy that while trying to figure out the situation with M.D.M. that DCF said they wanted to help, but they were listening to his son and not him. He believed DCF was talking to him like he had done something wrong and that DCF did not need to be messing with the family in the first place. He felt like they would make him jump through hoops so M.D.M. could have things his way. Father presented the recorded phone conversations he had with Cape and the supervisor and they were admitted into evidence.

On cross-examination, the prosecutor delved into the father-son relationship in this family. Father first admitted that M.D.M. got into trouble often at school. Father, however, did not know how frequently this trouble occurred; he stated his relationship was such that "we wasn't talking about his trouble too much." Father also disputed that he got upset when M.D.M. got suspended from school "[b]ecause at the end of the day, that's his life. He have to deal with that, I can just only help you, that is what a parent does." According to Father, M.D.M. should be upset if he is failing school "but that has nothing

10

to do with me." Father testified he was not mad that M.D.M. exposed himself to female students; he was mad because M.D.M. would listen to other students (who told him to do it) and not listen to his parents. Father repeatedly denied ever hitting M.D.M.

Father could not recall how often M.D.M. was suspended from school, but he was not sure because they did not have any "form of communication" with the school and he did not know what was going on at the school. Father testified that he wrote to the school asking for contact and communication, but at that time communication stopped. At the same time, they lost church support as well. Father denied, however that they had ever been hostile with school personnel. Father stated that M.D.M. had been suspended, it "didn't have nothing to do with me, (*sic*) that had something to do with the school if he got suspended at school." Father also stated that it should not only be him telling M.D.M. not to get into trouble, but the school and the community also had the responsibility as well.

Father admitted his voice would go in a higher pitch when he raises his voice, but that does not mean he was angry. He admitted, however, he had a very demanding personality. When he told Cape not to "bark no orders to me," it meant she was going to do whatever she wanted from his view of the situation. He believed that Cape was being disrespectful to him and violating his civil rights because he wanted a better investigation. He felt like Cape looked down on him and said, "I'm not that person."

When examined by the GAL, Father was specifically asked whether he was willing to do anything to get M.D.M. back home. Father refused to answer yes or no because he was a "grownup" and was "gonna give a grown answer." Father testified that he was willing to talk to M.D.M. and that if his son wanted to come home himself to the family, he was more than welcome to talk to Father about it. The problem, according to Father was "this right here," presumably referring to the State's involvement. When asked again if Father wanted M.D.M. home, he replied that "it's a work because you all make it

11

a work. You all made it a hard work." The social worker's file also reflected that the parents had engaged in no visitation with M.D.M. between the February and the June hearings, even though case managers had left phone messages for parents about arranging visitation regularly between February and August 2017. After some comments, the court took the case under advisement.

Approximately seven weeks later, the court reconvened the adjudication hearing at which the parents were present. The court announced its ruling from the bench, holding the State had failed to present clear and convincing evidence that M.D.M. had been subjected to physical abuse by his parents. Nevertheless, the court did find clear and convincing evidence—based upon the child's behavior at school, the anger issues reflected by Father during the hearing, and the child's reasonable fear about returning home—was sufficient to conclude that M.D.M. was a CINC under K.S.A. 2017 Supp. 38-2202(d)(1) (lack of parental care, control and subsistence) and under K.S.A. 2017 Supp. 38-2202(d)(2) (without the care or control necessary for the child's physical, mental and emotional health). The court then moved on to a disposition hearing.

In a journal entry filed on August 11, 2017, the district court found that based upon clear and convincing evidence M.D.M. met the standards of a child in need of care under K.S.A. 2017 Supp. 38-2202(d)(1) and (d)(2). The court ordered that M.D.M. remain in DCF's custody. In a disposition order filed the same day, the court held that all prior orders were to remain in effect and that reintegrating M.D.M. with his parents was viable and the goal of the permanency plan.

The parents timely appealed the CINC finding to this court.

*Did the State Prove by Clear and Convincing Evidence That M.D.M. Was a Child in Need of Care?*

On appeal, Father and Mother assert that the trial court's temporary order placing M.D.M. in DCF custody was premature and not supported by an adequate investigation. They follow up by asserting that because M.D.M. was improperly removed, their failure to cooperate with DCF and KVC cannot and is not grounds to establish by clear and convincing evidence that M.D.M. is a CINC.

*Standard of review and legal foundations*

In a CINC hearing, the trial court must find the State proved that the child meets the statutory definition for being in need of care by clear and convincing evidence. K.S.A. 2017 Supp. 38-2250; *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008). That is a comparably demanding standard requiring all necessary facts be proved "'highly probable.'" See 286 Kan. at 696. If a trial court determines a child to be in need of care, the case continues. If the child is not in need of care, then the trial court should dismiss the case. See K.S.A. 2017 Supp. 38-2251(a) and (b).

On appeal, the court reviewing a CINC adjudication must be convinced, based on the complete evidentiary record viewed in the light most favorable to the State as the prevailing party, that a rational fact-finder could have found that determination "highly probable, [that is, proved] by clear and convincing evidence." 286 Kan. at 705. The appellate court cannot reweigh evidence, redetermine the credibility of witnesses, or redecide factual disputes. 286 Kan. at 705. In other words, the court must resolve any evidentiary conflicts in the State's favor.

Child in need of care proceedings originate with the State's *parens patriae* interest in protecting the safety and welfare of children within its jurisdiction. See K.S.A. 2017

13

Supp. 38-2201(a) (proceedings "deemed to be pursuant to the parental power of the state"); K.S.A. 2017 Supp. 38-2201(b)(1) ("safety and welfare of a child to be paramount in all proceedings under the code"); *In re L.B.*, 42 Kan. App. 2d 837, 842, 217 P.3d 1004 (2009) (recognizing *parens patriae* foundation for proceedings), *rev. denied* 289 Kan. 1278 (2010). The Legislature has made it clear that the Revised Kansas Code for Care of Children shall be liberally construed to carry out the policies of the State. K.S.A. 2017 Supp. 38-2201(b).

*Challenge to the temporary custody order*

Under the Revised CINC code, "[a]n appeal may be taken by any party or interested party from any order of temporary custody, adjudication, disposition, finding of unfitness or termination of parental rights." K.S.A. 2017 Supp. 38-2273(a). By its plain language, the statute clearly provides for appellate review of any of five different types of orders in CINC proceedings: (1) temporary orders of custody, (2) orders of adjudication, (3) disposition orders, (4) orders finding a parent unfit, and (5) orders terminating parental rights. See *In re N.A.C.*, 299 Kan. 1100, Syl. ¶ 3, 329 P.3d 458 (2014) (the only appealable orders in a CINC case are the five categories listed in the statute).

Turning to the parents' challenge to the temporary order entered in this matter, we note that there are two reasons this court cannot address the propriety of that order. First, because the court already adjudicated M.D.M. as a CINC, the temporary custody order is moot. See *In re A.E.S.*, 48 Kan. App. 2d 761, 765, 298 P.3d 386 (2013) (adjudication order supersedes a temporary custody order). Second and most importantly, the temporary custody order was appealable when it was entered first; if a timely appeal is not taken after the order is issued, the right to appeal that order is waived, even if a later order is appealed. *In re L.B.*, 42 Kan. App. 2d at 838.

14

*The CINC finding*

Accordingly, our review is limited to whether the trial court's finding that M.D.M. was a CINC under K.S.A. 2017 Supp. 38-2202(d)(1) or (d)(2). K.S.A. 2017 Supp. 38-2202(d)(1) requires clear and convincing evidence that M.D.M. was without adequate parental care, control, or subsistence and the condition was not solely caused by the lack of financial means of the child's parents or other custodian. Under K.S.A. 2017 Supp. 38-2202(d)(2), the State must prove that M.D.M. was without the care or control necessary for the child's physical, mental, or emotional health.

Here, the evidence was sufficient to prove that it was "highly probable" M.D.M. was a child in need of care. Even before M.D.M. was placed in DCF custody, he was exhibiting misbehaviors in his school leading to one or more suspensions, including a suspension for exposing his penis to female students. He clearly exhibited anger management issues while at school and acted out aggressively when he believed he had been disrespected by fellow students or teachers. Despite those problems, Father knew little about the suspensions because that was not what he and M.D.M. talked about in "their relationship." Moreover, although Father vaguely reported that the family had been looking for programs to help M.D.M. before DCF's involvement, he failed to explain what efforts they were making to address M.D.M.'s obvious behavior issues at school.

Additionally concerning was Father's report that the parents had "no form of communication" with the school. Moreover, Father conceded that he did not know what was going on at the school. His testimony was extremely vague as to the source of this atypical lack of any communication. Although Father stated to DCF and at the hearing that the family had tried to communicate with the school, there was no explanation for the rift between the parents and school. Moreover, Father seemed to assert that any of M.D.M.'s problems at school were for the school to address and not his responsibility.

15

Thus, Father had essentially abdicated his parental responsibility to a teenager not mature enough to know how to cope with his frustrations and anger.

Father's testimony also reflected an unusual and perhaps unhealthy detachment from his 13-year-old son's behavior, essentially concluding that M.D.M. was old enough to make his own decisions and choices in life. Father's philosophy was that it was not his responsibility to tell his son what to do and that it was up to M.D.M. to "call the shots" for himself. Father was not concerned with M.D.M.'s decisions as long they did not involve him "in something that's negative." This parental detachment was confirmed when Father testified that he and M.D.M. were "like brothers and just support each other like that."

Regardless of whether M.D.M. was physically abused, his behavior at school was problematic enough that he had been suspended for a significant portion of the school year both before and after his removal from the home. His Father's "hands-off" approach was not helping M.D.M.'s situation at school and there was no reason to believe that the boy's behavior in school would have improved had he been returned to the parents' home. In the Mother's silence and the Father's dismissal of responsibility, M.D.M. was left with no one at home to help him develop coping skills that must be learned at this age.

It is readily apparent that Father disregarded the wellbeing of M.D.M. to vent his anger at DCF, whose main responsibility was to help Father and Mother to restore their broken relationship with their child. Indeed, the trial court concluded that because of Father's own anger management and hostile attitude, M.D.M. would not likely improve if he were returned to the home.

It is unassailable that parents' care for a child must be expressed by continuing to want a relationship with their child. How much better it is for parents to help an undisciplined child, who lacks self-control over his or her emotions, by showing a

16

continuing effort to have a loving and supportive relationship with that child. Moreover, how much better it is for the child to receive corrective discipline from the loving hearts of his or her parents at home. Here, both Father and Mother took no action to continue a loving and supportive relationship with M.D.M. Moreover, they took no action to prepare him for the challenges of life in our diverse society. As a result, they failed to provide the "care or control necessary for [M.D.M.'s] physical, mental, or emotional health." For these reasons, the trial court properly concluded that M.D.M. was a child in need of care.

Affirmed.

17